UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X


UNITED STATES OF AMERICA,

      -against-                                   **25 Cr. 480 (KMK)**


DAWAYN LINDSEY,

                       Defendant.
_____X


**SENTENCING MEMORANDUM ON BEHALF OF
THE DEFENDANT DAWAYN LINDSEY**


                                      James E. Neuman, P.C.
                                      Attorney for Defendant
                                      100 Lafayette Street
                                      Suite 501
                                      New York, NY 10013
                                      (212) 966-5612

**Preliminary Statement**

This memorandum is submitted on behalf of Dawayn Lindsey, whose sentencing is currently scheduled for April; 9, 2026.  Attached as Exhibit "A" are letters of support from Mr. Lindsey's friends and family.  Attached as Exhibit "B" are letters relevant to his employment and work with a non-profit organization.  Attached as Exhibit "C" is a report prepared by a mitigation expert.

On October 16, 2025, Mr. Lindsey pleaded guilty to conspiring to distribute testosterone and other steroids, in violation of 18 U.S.C. §§ 841(b)(1)(E) and 846.  The parties stipulated that his guideline range was 37-46 months of imprisonment.  The Probation Department recommends a sentence of 37 months. In view of Mr. Lindsey's background, his current familial obligations, and all the circumstances of this case. we urge this Court to impose a non-incarceratory sentence.  More specifically, we suggest a sentence or probation or supervised release, with conditions that include a lengthy period of home detention and a significant amount of community service.

**Personal background**

Mr. Lindsey, now 43 years old, was born and raised in Camden, New Jersey, an area riddled with crime and drugs.  PSR ¶¶ 51, 53; Exhibit C, pp.12-14. Through most of the first decade of his life, he lived with both parents.  His father worked in construction and supported Mr. Lindsey and his ten siblings.  But his father also was a crack addict and physically abusive to the whole family, requiring occasional intervention by family services. His father even sold the family's Christmas presents to support his addiction. Exhibit C, p.3. When Mr. Lindsey was six years old, he was placed in a foster home for six months, where he would be regularly abused and beaten. PSR ¶ 55; Exhibit C, p4. Briefly thereafter, Mr. Lindsey's father became sober and reunited with the family. When his

father relapsed again, though, his mother ended their relationship. Mr. Lindsey saw his father for the last time when he was 10 or 11 years old. PSR ¶ 55.

The following years were tumultuous. In order to avoid his father, Mr. Lindsey's mother frequently relocated the family. And without his father's financial support, the family relied upon public assistance which was insufficient to meet their basic needs. Often, Mr. Lindsey sought out nourishment and lodging with friends or other family members. Further, Mr. Lindsey's mother exercised little supervision, leading the children to many school absences. PSR ¶ 56. For a period, one older brother, Anthony, tried to act as father to the younger children, but that ended when he was struck by a bus and suffered catastrophic injuries. Exhibit B. Another brother, Antoyway, then tried to fill the role of father, but went to prison himself "just when Dawayn needed [him] most." Exhibit A (letter from Antoyway Lindsey). By the time Mr. Lindsey turned 14 years old, he had essentially stopped living at home on a regular basis. PSR ¶ 56.

With little stability and supervision in his life, Mr. Lindsey began using drugs and alcohol at a young age. When he was fifteen, he started drinking alcohol and smoking marijuana, eventually consuming both virtually every day. PSR ¶¶ 68-69. Inevitably, Mr. Lindsey's substance abuse, truancy, and lack of parental oversight led to police encounters. When he was just fifteen, he was arrested on robbery charges. PSR ¶ 37. Thereafter, he was sent to the Devereux residential youth center, where he remained until he was 17 years old. PSR ¶ 57.

Benefitting from some supervision, Mr. Lindsey actually thrived at Devereux. He attended school consistently, completed the tenth grade, and thrived at football so much that scouts told him he might be able to obtain a scholarship to college. PSR ¶ 57; Exhibit C, pp.4-5. When he was released and returned to live with his mother, he actively sought on his own to re-enroll in a public

school.  Due to his criminal record, though, the school insisted that his mother return with him and sign forms.  Inexplicably, his mother refused to do so, thereby preventing him from resuming school and shattering his dream of pursuing a football scholarship.  PSR ¶¶ 58, 72; Exhibit C, p.5.  Lacking structure and guidance, Mr. Lindsey's behavior deteriorated, leading to several arrests.

Specifically, when he was 18 years old, Mr. Lindsey was arrested for drug possession, resulting in a sentence of three years imprisonment.  PSR ¶ 38.  Thereafter, in March, 2005, when he was 22 years old, he was arrested for possession of a firearm, resulting in the imposition of a five year sentence in 2007.[1]  PSR ¶ 39.  Most notably, in November, 2005, when he was 23 years old, he was convicted of aggravated manslaughter in the first degree, for which he was sentenced to 16 years of imprisonment (running concurrently with the sentence on the firearm charge and another sentence for aggravated assault).[2]  PSR ¶¶ 41-42.

While incarcerated for the foregoing crimes, Mr. Lindsey incurred some disciplinary sanctions, while participating in myriad programs, including: electronics, cosmetology, parenting, masonry, forklift, ServSafe, welding, woodworking, and culinary arts.  He also attended therapy and substance abuse treatment, obtained a GED, and held numerous jobs, such as: food production, clothing manufacturing, dining hall, porter, meat processing, grounds construction and concrete, teacher's aide, sanitation, and food service. PSR ¶¶ 39, 41, 42, 72.

---

[1]     The PSR also indicates that, when Mr. Lindsey was 22 years old, he was "found guilty with no further penalty of" another drug offense in Philadelphia.

[2]     This conviction arose out of a confrontation Mr. Lindsey had with a man who had accused his girlfriend's daughter of breaking a car window.  Mr. Lindsey's recollection is that the man brandished a gun first.  One newspaper article indicates that the prosecutor's office acknowledged that the victim "may have fired a .380 caliber handgun." https://www.nj.com/south/2007/09/camden_man_sentenced_for_2005.html#:~:text=CAMDEN%20%2D%2D%20A%20city%20man,45%2Dcaliber%20handgun.

After his release, in 2019, Mr. Lindsey moved in with his brother and his sister-in-law and he entered into a committed relationship with Ashley Kinard, with whom he would eventually have two children.  PR ¶ 59. He sought work but had difficulty finding stable employment due to his record. Exhibit B, pp.6-7. He also participated in a substance abuse treatment program, but continued drinking. PSR ¶¶ 68, 70. One family member recalls that he was really "not ready" to take advice and persisted in "going out, drinking too much, acting the fool with his friends."  Exhibit A (letter from Jamie Hill).   One drunken night, he fired a weapon, ultimately leading to another arrest and a five year sentence for unlawful possession of a weapon. PSR ¶ 44.  Mr. Lindsey now says that he was "drunk and stupid" and remains very angry at himself for this conduct.  Exhibit C, p.6.

When he was released from the latter sentence in January, 2024, though, it appeared to observers that Mr. Lindsey had truly changed.  His family saw that he was now "centered," "focused," and "determined" to take constructive steps at improving himself.  Exhibit A (letter from Jamie Hill). He moved in with Ms. Kinard, her three children from another relationship, her grandchild, and their daughter, who was born in 2021, and immediately became a very loving and involved father to all of the children.  Exhibit A (letter from Jamie Hill).  In April, 2024, he began working full-time as a driver for a bakery, eagerly agreeing to work as many as 12 hours a day, often during overnight shifts. PSR ¶ 76; Exhibit B (letter from Michael Davis). Further, he enrolled in a class to obtain a commercial driver's license, with plans to start his own box truck company.  PSR ¶ 75; Exhibit C, p.7.  By all accounts, he seemed to be doing everything possible to be productive.

In September of 2024, however, Mr. Lindsey fractured his patella during work when he fell from his vehicle, preventing him from working or attending the CDL course, and requiring physical therapy for months thereafter. PSR ¶ 64; Exhibit C, p.7. During that time, he received workman's

compensation, but it was only 70% of his wages. PSR ¶23.  Insofar as he was now the sole financial support for his girlfriend and six children, he felt considerable financial pressure.  Accordingly, he agreed to participate in the offense conduct with his long-time friend, Joseph Thompson.

**The offense conduct**

As recounted in the pre-sentence investigation report, the totality of the offense conduct by all of the defendants and conspirators lasted from at least September, 2021 through February, 2025, and entailed both a scheme to distribute steroids through a website known as "Gorilla King," and engage in money laundering.  PSR ¶ 5. But Mr. Lindsey's participation was both more narrow and short-lived.  First, on August 16, 2024 – reportedly after a known co-conspirator fled law enforcement surveillance earlier that day – Mr. Lindsey, Mr. Thompson, and Carl Bezick removed approximately 15 large bins of materials from one location in Philadelphia.[3] PSR ¶ 13.  Second, Mr. Lindsey and Mr. Thompson removed additional items from that location on September 13, 2024.  PSR ¶ 13.

And between November 3, 2024 and February 4, 2025, law enforcement observed Mr. Lindsey entering a second location at Godfrey Avenue in Philadelphia on 24 separate occasions, "typically arriving late at night with Thompson or another co-conspirator and leaving the following morning." PSR ¶ 14.  On the last of those occasions – on February 6, 2025 – Mr. Lindsey and Thomas were each present at the Godfrey Avenue, wearing rubber gloves, when law enforcement entered the premises and found hundreds of vials of steroids, tens of thousands of grams of steroids, order books, and packaging and mailing materials. PSR ¶¶ 16-17. Both men were arrested the same day.

---

[3]    Mr. Lindsey was not aware of the contents of those boxes at the time that he helped move them and did not receive payment for helping move those boxes.

**Pretrial supervision**

Following his arrest, Mr. Lindsey was released on a bond, at a time when he was still recovering and receiving worker's compensation. About one month later – over the recommendations of his doctor who thought he should recuperate longer – he resumed working full-time at his bakery job.  In March, his work was interrupted when he sustained an injury to his hand in a motorcycle accident, requiring surgery weeks later.  But thereafter, he returned to his job, generally working from 10:30 p.m. to 6:30 a.m, as well as occasional overtime.

In addition, starting in the summer of 2025, Mr. Lindsey attended classes from 7:30 a.m. to 3 p.m. to obtain a commercial driver's license.  Exhibit C.  Anticipating the license and hoping to start a business, he registered his own company ("Street2Street LLC) in the fall.  And in December, 2025, he graduated from that course (with high grades) and received his CDL.  PSR ¶ 74; Exhibit B (letter from Jeanette Stein); Exhibit B, p.7.  About two months ago, Mr. Lindsey also started working with a financial coach, who has been advising him how to manage his finances and plan his trucking business.  Exhibit B (letter from Barry Langer). Most recently, he has met with a number of local community groups with a view towards participating in various volunteer efforts. , discussed in more detail *infra.*  Exhibit B (letter from Kenny Holdsman).

Throughout his time on pre-trial supervision, he has also continued to be a dedicated father to his children and step-children. And he has remained compliant with all conditions of his release. Aside from testing twice for alcohol early in his supervision, he has abstained from alcohol and any other substances. He attended an outpatient substance abuse program throughout most of his supervision and successfully completed the program on December 24, 2025.  PSR ¶ 70.

**The Plea and PSR**

On October 16, 2025, Mr. Lindsey pleaded to a single-count Information, charging him with conspiring to distribute Schedule III controlled substances in violation of 21 U.S.C. §§ 841(b)(1)(E) and 846. In the plea agreement, the parties stipulated that: the base offense level was 20 because the offense involved more than 60,000 units of Schedule III substances, pursuant to U.S.S.G. § 2D1.1; a 2-level reduction applied for minor role, pursuant to U.S.S.G. § 3B1.2(b); a 3-level reduction applied for acceptance of responsibility; the adjusted offense level was 15; Mr. Lindsey fell in Criminal History Category V; and his guideline range was 37-46 months of imprisonment.

The Probation Office concurs with the guideline calculation and recommends a term of 37 months of imprisonment.

## POINT I

### THE DEFENDANT SHOULD BE SENTENCED TO A NON-INCARCERATORY SENTENCE, INCLUDING A LENGTHY PERIOD OF HOME DETENTION AND SIGNIFICANT AMOUNT OF COMMUNITY SERVICE

The very first sentence of § 3553(a) declares that the court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of this subsection." § 3553 then directs the sentencing court to consider "the nature and circumstances of the offense and the history of the defendant," as well as the need for the sentence:

> "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

-7-

Among other factors that must be considered are "the kinds of sentences available," such as community service or home detention, (subsection 3), the sentencing guidelines (subsection 4), and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar crimes (subsection 6). *See generally, United States v Salinas,* 365 F.3d 582, 589 (7th Cir. 2004). In this case, we believe that due consideration of all of these factors warrants a non-incarceratory sentence, coupled with a period of home detention and community service.

Initially, we although we agree with the guideline calculation, we submit that the guidelines are entitled to little weight because they rest on the unjustified premise that drug quantity is an accurate proxy for culpability. *See e.g., United States v Dossie,* 851 F.Supp.2d 478, 481 (E.D.N.Y. 2012). In *United States v Diaz,* 2013 WL 322243 (E.D.N.Y. 2013), Judge Gleeson recounted the development of the narcotics guidelines and concluded that they were not based upon empirical data or any expert opinion, thereby entitling them to much less weight. *Diaz,* 2013 WL 322243, at *1. Further, he argued that role is more indicative of culpability than drug quantity:

> "A more useful factor in determining culpability is not quantity, but role. The managers and leaders of a drug organization actively plan the organization's activities, plot to increase its profits, and recruit its members. As a result, they are more likely to initiate crimes related to their drug enterprise and will be driven to increase the scale of those crimes, They are also more likely to commit new crimes in the future. By contrast, a low-level dealer or courier is easily replaceable and does little to advance the overall goals of the drug organization. He or she may be driven to crime by poverty or addiction, problems that can be addressed without incarceration. He or she will be less likely to recidivate in the future; if a term of incarceration is imposed, 'a short prison sentence is just as likely to deter them from future offending as a long prison sentence.' Rational sentencing policies will favor lengthier sentences for managers and leaders than for low-level workers because of their respective roles, not because of the quantities of drugs that happen to be involved in their offenses." *Diaz,* 2013 WL 322243, at *13.

Similarly, drug quantity is a poor proxy for Mr. Lindsey's culpability in this case. For as explained *infra,* his role in the overall conspiracy, and corresponding profit, was relatively minor. Accordingly, this Court should place little weight on the offense level dictated by the Guidelines. *See also, United States v Cabrera,* 567 F.Supp.2d at 276-77, *supra* ("the Sentencing Commission has never explained how drug quantity is meant to measure offense seriousness, and significantly, how it correlates with the purposes of sentencing under 18 U.S.C. § 3553(a)").

Setting the guidelines aside, we still acknowledge that the conduct is serious. Through his actions, Mr. Lindsey helped distribute testosterone and similar steroids without a license. Although he lacks a medical degree, he understands now that this type of unsupervised dispensation of controlled substances posed a threat and could have had serious medical consequences. And he is truly remorseful for anything he did to contribute to that threat. Still, there are numerous mitigating circumstances that this Court should consider.

First, the PSR makes clear that Mr. Lindsey's role in the offense was much more limited than his co-conspirators. Apparently, the overall scheme to distribute controlled substances lasted from at least September, 2021 through February, 2025. But Mr. Lindsey's conduct, at most, occurred over several months (between September, 2024-February, 2025), with most of his reported activities happening during the two-month period of early November, 2024 through early February, 2025.

Moreover, the nature and scope of Mr. Lindsey's conduct was much less significant than Carl Bezick and Joseph Thompson (the two co-conspirators identified in the PSR). According to the complaint filed against those individuals, both were allegedly involved in money laundering over $1.5 million dollars, as well as distributing narcotics. They used aliases and created advertisements on a web page to sell testosterone and other steroids. Mr. Lindsey not only did not participate in

money laundering or the website activities, he was not even aware of such conduct. In contrast, Mr. Lindsey's activities essentially consisted of: (1) moving boxes of materials out of one location on two dates; and. (2) assisting at a location in Philadelphia where Thompson mixed and packaged testosterone and other steroids, on 24 occasions. The limited nature of Mr. Lindsey's activities is reflected by the amount he profited.  His recollection is that he only earned approximately $4,000-5,000 altogether, which apparently is a fraction of what his co-conspirators earned.  Thus, the parties (and Probation Department) have agreed that Mr. Lindsey is entitled to a minor-role reduction.

Another mitigating factor is Mr. Lindsey's difficult background, which plainly was a significant contributing factor to his past crimes (and high criminal history score).  His father was a crack addict who physically abused Mr. Lindsey and other family members.  When he was six years old, Mr. Lindsey was placed in a foster home for six months, where he was also abused and beaten. By the time he was ten years old, his father was absent completely, providing neither emotional nor financial support.  Though his older brothers would try to offer some guidance, they had their own difficulties. Among other things, one older brother went to prison himself.

Thus, in his formative years Mr. Lindsey was exposed to crimes and drugs, physically abused, and deprived of positive role models, all conditions which courts have routinely recognized as mitigating.  *See, United States v Bannister,* 786 F.Supp. 2d 617,  642 (E.D.N.Y. 2011 (noting how lack of male parental guidance is a known contributor to crime); Cobb-Clark & Tekin, *Fathers and Youths' Delinquent Behavior,* 12 Rev. of Econ. of the Household, 327 (2013) (same); *accord, Landrigan v Schriro,* 441 F.3d 638, 648 (9th Cir. 2006); *see also,  United States v Walter,* 256 F.3d 891, 894 (9th Cir. 2001) (noting that traumatic events can impact a person's development); *United States v Rivera,* 192 F.3d 81, 84 (2nd Cir. 1999).

Exacerbating matters further was the fact that the family lacked sufficient funds for basic needs. Often, the family had to move because they could not afford the rent, which in turn led to missing school intermittently. These types of disruptions and challenges surely made Mr. Lindsey more susceptible to making poor decisions. *See generally, Landrigan v Schriro,* 441 F.3d 638, 648 (a defendant whose crime is attributable to a disadvantaged background is less culpable than one without that excuse); *accord, Landrigan v Schriro,* 441 F.3d 638, 648 (9th Cir. 2006); *United States v Collington,* 461 F.3d 805, 809 (6th Cir. 2006).  In fact, by the time he was fifteen, Mr. Lindsey was smoking marijuana and drinking alcohol regularly.  Invetiably, arrests soon followed.

For a period, though, Mr. Lindsey appeared to benefit from additional supervision.  While at a residential youth center between the ages of 15-17, he made positive strides.  He attended classes regularly, completed the tenth grade, and excelled at sports to the point that he had realistic hopes of obtaining a football scholarship. But when he was released, his mother inexplicably failed to sign the paperwork necessary for him to enroll at a local high school, leaving him once more in an unstructured environment.  He  resumed using drugs and incurred more arrests.  Most significantly, in 2005 –when he was 23 years old – he was sentenced to 16 years of imprisonment for aggravated manslaughter (and concurrent terms on other charges).

In the following years, Mr. Lindsey showed halting signs of maturing. During imprisonment, he took numerous courses and obtained a GED.  Once released from prison in 2019, he entered into a long-term relationship with his present girlfriend, sought out various employment, and participated in a substance abuse program.  Admittedly, however, he was not yet ready to make a definitive change in his life.  For he continued to drink excessively, which led to more criminal conduct and the imposition of a five-year sentence on weapons possession charges.

But perhaps spurred on by the birth of his daughter while in prison, Mr. Lindsey exhibited an unequivocal desire to turn his life around once and for all when he was released in January, 2024. He immediately moved in with his girlfriend, who was living with their daughter, three of her own children, and a grandchild.  Later that year, he also had a son with his girlfriend.  As one stepdaughter now writes, Mr. Lindsey fully embraced the role of father to all of them:

> "In addition to our loving stepdad/ stepdaughter relationship, he is also an amazing grandpa/father figure to my baby girl. My baby never got to really know her biological father. He was killed due to gun violence. **** But my stepdad stepped into that role like it was the most natural thing in the world **** He always made sure to include her in everything and never made her feel left out. He treats her no different than his biological children. He loves her like his own and nothing in the world could ever change that. She lost her father, and my stepdad made sure she still knows what it feels like to have a man who shows up for her. I will never forget that and neither will she.
>
> "My stepdad is the center of the household. He is always the man that everyone in the family calls on and loves the most. One thing about my stepdad: he would go to the moon and back to make sure everyone in the family is happy and has what they need. He's the man that everyone knows they can count on no matter the time of day. He's the type of person who would drop anything he's doing to rush to the rescue. No matter the scenario we know he's the one that's coming in a flash. He's the type of person who would give his last to make sure someone else is happy and satisfied and I can say that's why he's the favorite and the one that everyone would call on." Exhibit A (letter from Tayniyah Kinard.

Similarly, Mr. Lindsey's sister-in-law writes:

> "When he came home this last time, everything was different. I noticed it the moment I saw him. He was centered. Focused. He had a plan and he was working it with a determination I had never seen in him before **** he also became the center of a household. His girlfriend's children needed a father figure and he became one. He picks them up from school. He does homework with them. He takes a real interest in who each of them is. When I think of one word to describe Dawayn Lindsey, the word is DAD. Not because it is a role he was assigned but because it is who he chose to become. His youngest daughter was born

-12-

while he was incarcerated. He has been making up for that ever since, and he will keep making up for it for the rest of his life if you let him. His son was born a year ago and Dawayn is the absolute center of his world. They are bonded in a way that melts the heart. We tease him that his baby got the softest feet, because when Dawayn is around they never touch the ground. That child only wants to be in Dawayn's arms where he knows he is safe and protected."

And his girl-friend, Ashley Kinard states in her letter:

"Dawayn is the center of our household and he radiates a kind of love that makes everyone in it feel safe. He shows my son, who is eleven and whose father was never present, what it looks like for a man to be responsible how to treat people with respect, how to work and provide, how to keep your word, how to take care of a home, how to treat a woman. He does not lecture. He just does these things and my son watches **** My biggest concern is our son, Dawayn Jr. He is one year old and he is so attached to his father. He only wants to be in one place and that is in Dawayn's arms. Nothing makes Dawayn be happier. Our son is always looking around for his dad and as soon as he sees him it is like no one else exists. Dawayn is so patient and just picks him and continues doing whatever he was working on with our son in his arms. I get it. He makes us all feel so safe. I worry what will happen if suddenly Dawayn disappeared. He is too young to understand and I am afraid of what it will do to him." Exhibit A (letter from Ashley Kinard).

Further, Mr. Lindsey quickly found full-time employment driving for a bakery (from 10:30 pm to 6:30 a.m.), even while taking classes to obtain a commercial driver's license (from 7:30 a.m to 3:30 p.m.). As his brother recounts:

"when he came home this time, I could see something changed. Dawayn was determined to get it right in a way I never saw in him before. He had a plan and was focused on carrying it out. I watched Dawayn work nights at the bakery and go straight to CDL school in the morning and come home and take care of those kids and do it all over again. I have never seen anyone work so hard. When he got his CDL, I was so proud of him I don't have words for it. He cried and I understood why. That license meant he had done something no one in our family had ever done. He studied hard and got rewarded. For us rewards are something that get dangled always a little out of reach and keep moving so you never quite get them. He really thought he got

-13-

something no one could take away. He registered a company. He was already out there looking for loads to haul. He walked into businesses cold and talked to people and they took him seriously. I saw it happen." Exhibit A (letter from Antoywayn Lindsey).

His long-time friend, Lewis Golden Miller, also attests to the determination Mr. Lindsey showed when he was released from prison:

"When Dawayn came home, I told him. I told him and I told a hundred other men in this neighborhood a CDL can change your life. Anything you do toward a real career is a step forward, because we did not learn this growing up. We did not know people with careers. We did not see that path. We knew the streets because that is what was in front of us. I wanted Dawayn to see something different, because I had seen it myself.

"Not everyone listened to me. But Dawayn listened and he acted. He found out how to get the training. He worked nights at a bakery and went to school in the mornings. He let me help him study. He asked for my help. He got hurt and had to start over and he did that too. He earned a perfect score. He registered his own company, Street2Street, because he wasn't just thinking about a job he was thinking about a future. I have watched a lot of men come home from prison and try to get it right. I have not seen many do it the way Dawayn did it. He was fully committed in a way I recognized because I had felt it myself." Exhibit A (letter from Lewis Golden Miller).

Thus, in 2024, there was strong reason to believe that Mr. Lindsey had truly transformed himself into a dedicated family man, who was willing to work long hours and educate himself in the pursuit of better employment – all of which are strong indicators against recidivism. *See, United States v Alba,* 933 F.2d 1117 (2nd. Cir. 1991); *see also, United States v Pauley,* 511 F.3d 468 (4th Cir. 2007). *United States v Ruff.* 535 F.3d 999 (9th Cir. 2008); *United States v Sayad,* 589 F.3d 1110 (10th Cir. 2009) (strong family support aids rehabilitation).

Mr. Lindsey's transformation, however, was interrupted when he fractured his patella during work, while falling from the box truck. As a result, he was unable to work for months (and unable

-14-

to attend the CDL course).  Although he was able to receive worker's compensation, that did not equal his salary, which he desperately needed: for he was now the sole financial support for his girlfriend and the six children in the household. It was in this context that Mr. Lindsey accepted an offer from his friend, Joseph Thompson, to engage in the offense conduct. But for his financial difficulty brought on by his accident, Mr. Lindsey never would have agreed to the work.  And he did so with the expectation that the work would be a temporary bridge until he was medically cleared to return to the bakery job.

It also bears noting that Mr. Lindsey simply did not view the offense conduct nearly as serious as selling crack or other street drugs. As someone who was raised in a crime-ridden environment, and exposed to drug dealers inside and outside of prison, Mr. Lindsey could have easily sought out and found opportunities to sell crack, cocaine, heroin, or similar drugs on the streets.  He could have resorted to the use of firearms in furtherance of such drugs.  He could have involved himself with gangs.  But he did none of those things because he wanted to avoid conduct that he recognized and intuitively understood was blatantly dangerous.[4]

To be clear, Mr. Lindsey *now* understands the dangers of distributing steroids without proper medical supervision. And it is fair to say that he turned a blind eye to activity that he should have realized was both suspicious and dangerous. But he sincerely did not appreciate the gravity of his own conduct, nor understand the full scope of conduct by his co-conspirators. And while his attitude at the time obviously does not excuse his conduct, we submit that it does provide a basis for distinguishing this crime from his past crimes.

---

[4]    In fact, his brother Antoywayn states in his letter that he had been offered the same work, did not even view it as illegal, and had recommended that Mr. Lindsey take the job himself, since he needed work.  Exhibit A (letter from Antoywayn Lindsey).

To put it more plainly, Mr. Lindsey's participation in the charged crime should not be construed as a relapse to his prior crimes or evidence that he poses a future danger. For the circumstances that led Mr. Lindsey to commit the crime will not recur. Now that he is again able to work full-time, and able to obtain better employment with his CDL and own incorporated business, he will likely not face the same economic difficulties that prompted him to engage in the offense conduct. And now that he has a better appreciation of the dangers and illegality of distributing steroids without a medical license, he will certainly never do anything similar again.

Indeed, Mr. Lindsey has taken many concrete, affirmative steps since his arrest to ensure that he will not commit another crime. First, he attended a substance abuse treatment program throughout his supervision and completed the program in December, 2025 (having only tested positive twice for alcohol months earlier); his successful completion of that program are significant steps towards rehabilitation, particularly considering the role his substance abuse played in his prior offenses.

Second, during this past year Mr. Lindsey completed a course and obtained his CDL, enabling him to find better-paying, more stable employment. In fact, but for the travel restrictions imposed as a condition for his release, he would have been able to obtain such work already. Additionally, a few months ago he incorporated a company with the intention of starting his own box truck company, thereby demonstrating a genuine desire and ambition to develop a career. For the past two months, he has also been working with a financial coach who has been mentoring him on basic financial skills, such as tracking spending and opening a savings account, as well as advising him how he can realistically save money to invest in his company. Exhibit B (letter from Barry Langer). All of these steps collectively have made Mr. Lindsey much better equipped both to improve his job prospects, manage his personal expenses, and minimize future financial pressures.

-16-

Just as significant – though less tangible – Mr. Lindsey has spent the past couple of years reflecting upon his mistakes and resolving never to repeat them. As already noted, the annexed letters show how much the family has been impressed with his determination to correct his behavior and support his family. Similarly, the Mitigation Report is replete with anecdotes about Mr. Lindsey's efforts to take stock of his errors and take affirmative steps to improve various aspects of his life. Indeed, Mr. Lindsey has not only continued to be a great source of financial and emotional support to his children, his step-children, and his entire family, he has become a model of good behavior to his loved ones.

As many courts have recognized, such good post-arrest behavior is a compelling basis for leniency. *Pepper v United States,* 562 U.S. 476, 492-93 (2011) (discussing relevance of post-arrest rehabilitation); *United States v Williams,* 65 F.3d 301, 305 (2nd Cir. 1995); *see also United States v Munoz-Nava,* 524 F.3d 1137, 1149 (10th Cir. 2008) (variance warranted by defendant's exemplary behavior while on pre-trial release for 18 months); *accord, United States v Baker,* 502 F.3d 465, 467 (6th Cir. 2007) (variance from range of 27-33 months (for possession of firearms) to probation because the defendant behaved "exceedingly well" under pre-trial supervision); *see generally, United States v Workman,* 80 F.3d 688, 701 (2nd Cir. 1996).

Further, we note that any sentence of incarceration would have a terrible impact upon Mr. Lindsey's family. Currently, he is the sole provider for seven people: his girlfriend, their two small children, his girlfriend's three children, and his girlfriend's grandchild. PSR ¶ 60. If he is incarcerated and unable to continue to provide financial support, all of those individuals will, at a minimum, be relegated to public assistance. The crucial role Mr. Lindsey plays in supporting his family merits this Court's consideration. *See e.g., United States v R.V.,* 157 F.Supp.3d 207, 255-260 (E.D.N.Y. 2016);

*United States v Lehmann,* 513 F.3d 805, 806-807 (8th Cir. 2008); *United States v Bailey,* 369 F.Supp. 2nd 1090, 1101 (D. Neb. 2005); *United States v Pena,* 930 F.2d 1486, 1495 (10th Cir. 1991); *United States v Norton,* 218 F.Supp. 2d 1014, 1018-19 (E.D. Wis. 2002); *United States v Tineo,* 2000 WL 759837 (S.D.N.Y. 2000).

Considering the circumstances that led to the offense conduct and the constructive steps Mr. Lindsey has taken since then, we submit that a term of probation and home detention would be more than sufficient to deter him from future crime or protect the public.  As many jurists have observed, "home detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the deterrent of crime and amply retributive." *United States v Coughlin,* 2008 WL 313099, *5 (W.D. Ark. 2008); *see generally, Gall v United States,* 552 U.S. 38, 44 (2007); *accord, United States v Stall,* 581 F.3d 276, 286 (6th Cir. 2009); *United States v Munoz-Nava,* 524 F.3d 1137, 1149 (10th Cir. 2008) ("home confinement and supervised release substantially restrict the liberty of a defendant"); *United States v Gardellini,* 545 F.3d 1089 (D.C. Cir. 2008); *United States v Howe,* 543 F.3d 128, 140 (3rd Cir. 2008).

Moreover, we are not suggesting mere probation and home detention, but an added condition of community service (at any hours this Court deems appropriate).  In recent months, Mr. Lindsey has been in contact with a number of non-profit groups.  One group, "Philadelphia Youth Basketball," has offered him a "formal volunteer role" as a "Community Mentor and Youth Presenter."  As indicated in the letter from that organization, the role being offered is very structured, involving regular group presentations, one-on-one mentorship, speaking at workforce workshops, and other activities.  The letter also makes clear that the offer is not one they make lightly; rather, they made the offer only after reviewing Mr. Lindsey's background, history, and record of accomplishments

since his most recent release from prison.  Exhibit B (letter from Kenny Holdsman).  A sentence that permits Mr. Lindsey to volunteer time at Philadelphia Youth Basketball, we submit, would be much more productive than incarceration, both for Mr. Lindsey and his community.

Accordingly, we propose the following type of sentence: probation, with the condition of an extended term of home detention or home incarceration (whichever allows for Mr. Lindsey to remain employed), and the condition of significant hours of community service.  Such a sentence, we believe, would satisfy all of the statutory sentencing goals.

Dated:  New York, NY
         March 26, 2026

_____/s/_____
James E. Neuman, P.C.
Attorney for Defendant Dawayn Lindsey
100 Lafayette Street
Suite 501
New York, NY 10013
(212) 966-5612
