

# Zedek Partners, LLC
Mitigation and Sentencing Advocacy
Private Investigation

March 26, 2026

To:   James E. Neuman, Esq.
      100 Lafayette Street, Suite 501
      New York, NY 10013

Re:   United States v. Dawayn Lindsey
      2025-CR-00048

## Dawayn Lindsey Mitigation Report

## I.  EXECUTIVE SUMMARY

Dawayn Lindsey is forty-three years old. His story, on the surface, may seem familiar to courts around the country. He is the fifth of eleven children raised by a single mother in Camden, New Jersey — one of the poorest and most racially isolated cities in the United States — where the crack epidemic did not merely create addiction but dismantled families, hollowed  out institutions, and left an entire generation of children to raise themselves on streets that taught them everything except how to survive within the legitimate world. His father was, by all accounts, a good man before crack took him — a business owner, a churchgoer, a presence. He did not survive the drug. He abandoned the family. Dawayn and his brothers were raised largely by each other, as their mother's time and energy were consumed by the younger children. They cycled through a criminal justice system that, by the measure of its own Sentencing Commission's data, made them more likely to reoffend, not less.

But Dawayn Lindsey had something that many children raised in similar circumstances do not. He had a mother who, despite everything, taught her eleven children that there was always more room in the house and always more love in their hearts for those who had less. He had a family that was, against all odds, extraordinarily close and looked out for the neighborhood children because that was simply what good people did. Those values have managed to persevere despite the harsh conditions. Those who know him best invariably describe Dawayn Lindsey as reliable, generous, forgiving to a fault, a man who gives every person the benefit of the doubt even when — as this case exemplifies — doing so costs him dearly.

What distinguishes this case from others that might superficially resemble it is what Dawayn Lindsey was doing when the arrest came. He was not idling. He was not drifting back toward his old life. He was executing a plan he had constructed inside a prison cell and relentlessly pursued from the day he came home. This pursuit he simply calls becoming *civilized* — a word he uses to describe a specific vision: a home full of warmth and stability, where each person strives

to achieve their full potential within the institutions he had spent his life believing were not built for people like him. Dawayne is the primary breadwinner and caregiver for six children and stepchildren ranging in age from one to twenty, in a household where every other father is absent. He leads by example and his children reap the benefits.

To become *civilized*, Dawayn has put together a rigorous schedule which includes working overnight shifts at a bakery — 10:30 pm to 6:30 am — stopping home to get the kids ready for school before going directly to CDL training each morning. When a workplace injury derailed his schooling and his income, he did not stop. He took a temporary ████ position through a trusted friend to bridge the gap, intending to return to his bakery job and CDL program as soon as he was medically cleared. That position — at a professionally managed commercial building in Northeast Philadelphia housing dozens of lawful businesses — is what led to his arrest.

But despite his arrest, Dawayn has not stopped moving forward. He returned to his delivery job. He went back to CDL school and finished with the highest marks in every subject — a perfect 100 in all three competency areas. He registered Street2Street LLC and obtained an Employer Identification Number because he wanted to do everything right. He worked with a financial coach to take control of his finances, clear his debts, and open his first savings account. He participated in alcohol treatment and emerged from it with a clarity he describes not as sacrifice but as revelation. He has done all of this without a roadmap, without role models, and with a federal case hanging over everything.

The question before this Court is what a just sentence looks like for Dawayn Lindsey— one that accounts for his history, his documented rehabilitation, his family's irreplaceable dependence on his presence, his peripheral role in the instant offense, and the Sentencing Commission's own data showing that community supervision outperforms incarceration for defendants situated precisely as Dawayn Lindsey is. The charge before this Court did not arise from a return to his old life. It arose from trust misplaced in a friend, in a building that looked legitimate because it was designed to, in a job he took to survive an injury so he could get back to the plan. The mitigating circumstances documented in the pages that follow are substantial. The case for a sentence that keeps him in his community — present for his children, running his business, mentoring the neighborhood boys who are watching to see what happens to a man who tried — is not a case for leniency. It is a case for a just sentence that serves each important purpose without the one consequence that serves none of them: removing a present, working, sober father of six from the household that has no plan without him.

He named his company Street2Street. He knows where he came from. He has shown, in every way available to him, exactly where he intends to go.

## II. CHILDHOOD AND DEVELOPMENT

### A. Family Background

Dawayn Lindsey was born on November 11, 1982, in Camden, New Jersey, the fifth of eleven children born to Patricia O'Neil (born 1961) and Anthony Lindsey (born 1957). His mother was sixteen when she had her first child. Over the next seventeen years, she had ten more. The children were born approximately one year apart. *"There were times when a couple of us were the same age,"* Dawayn says. *"That is how close in age we are."*

His father was not present. Anthony Lindsey was addicted to crack cocaine. Before the addiction, by all accounts, he had been a different man—one who ran a construction company, who took the family to church. That man did not survive the drugs. The last time Dawayn saw his father as a young child, he was six years old, and his father had just stolen the family's Christmas gifts. He would not see him again until they ended up in the same county jail years later, when a court scheduling error brought his father to Dawayn's hearing by mistake. His father recognized him only because he had heard his name called.

Dawayn's mother, Patricia O'Neil, did the best she could. His older brother Antoywayn—who served as a de facto father to the younger children—describes her with warmth: *"She taught us there can always be more room in the house, more room in our hearts."* She took in neighborhood children when she already had eleven of her own. She was also overwhelmed—and physically harsh when the children got out of line. Dawayn does not fault her. "*I can't fault my mom for nothing,"* he says. *"She had too many kids to raise to be thinking everything is going to go perfect."*

When Dawayn was eleven years old, his brother Anthony—then seventeen—was struck by a New Jersey Transit bus.[1] The accident was catastrophic. Anthony sustained severe brain damage and spent months at the Children's Hospital of Philadelphia ("CHOP"), his life and capabilities permanently altered. For the Lindsey siblings, Anthony's hospitalization became something unexpected: a lesson in how to love. The family arrived at CHOP in force during visiting hours—ten children and whoever else their mother had taken in, filling the hallways, a small army of presence. What they found there disturbed them. Ward after ward held children whose families had not come. Children who had been forgotten. So the Lindsey children stayed for those children too. They sat with a boy who had lost both legs. They visited a kid named Kelly, shot so many times from head to toe that the doctors who saved him seemed to have surprised even themselves. They bought everyone McDonald's. They came back. Antoywayn puts it simply: *"There were so many kids who were just forgotten. No one came to see them. So we did."* Dawayn chimes in:

---

[1] *Teen Hurt in Crash in Camden*, Courier-Post, September 25, 1994

> *"That is what good comes from there being so many of us. We can't stand to see anyone alone. We treated them like our brothers. We don't know how to treat people any other way...Man, I used to love to go up there and see them kids."*

This was not charity in any formal sense. It was simply what their mother had modeled—that a crowded house means there is always room for one more, and that the only proper response to someone in pain is to show up. Dawayn Lindsey learned that lesson before he learned most others, in the pediatric wards of a children's hospital, buying Happy Meals for strangers with whatever money the family had.

Patricia O'Neil died on October 19, 2011, at age fifty, while Dawayn was incarcerated. He was never told the cause of death. Different brothers offered different explanations—a brain condition, lung cancer, some other cancer. *"I guess I will never know,"* Dawayn says. *"I am ok with that though because then I don't have to know what kind of pain she was in."* He tells this story through tears. Tears come naturally for Dawayn. He doesn't try to hide them. During our conversations, I would see those tears in connection with lessons from his past which are so clearly eternally present.

### B. Foster Care

DYFUS—the Division of Youth and Family Services—was involved with the family throughout Dawayn's childhood. He was approximately six years old the one time he was formally removed and placed in foster care, separated from his siblings for what he recalls as six months in a stranger's home.

The placement was not safe. *"It wasn't a good home. I got beat bad in that home,"* he says. *"I really hate that house. I got to ride by it a lot and every time I get sick inside. Bad memories in that house."* There are more tears. When asked whether his mother had also hit him, he acknowledged she had—but this woman was not his mother. The distinction matters to him. He was a kindergartener, placed by the state in a home where he was beaten by strangers who were supposed to protect him. He learned from both these experiences. He never hits his children. *"It was different back then. I don't fault my mom. That is what she knew. But how you going to teach your child violence is not the way if you are always meeting them with violence?"*

The family was eventually reunited after his father, in a rare moment of effort and sobriety, got himself clean specifically to get his children out of foster care. It did not last. The father relapsed, sold everything, and disappeared again. The children scattered—some to cousins, some back to their mother. Dawayn did not remember this story. His brother Antoywayn reminded him during one of our conversations. More tears. He had been holding on his father's abandonment and has now begun to release it. *"I think I can forgive him now. I am not ready to call him yet. But I know I will. Everything in its time."*

4

## C. *Football, Promise, and the Door That Closed*

Dawayn Lindsey was, by every account, gifted in many ways. Every person interviewed for this report has noted his kind nature, his devotion to family, his reliability and generosity, and the dedication he has devoted to his own rehabilitation. His brother Antoywayn describes him as a child who could be shown anything once and replicate it. He marvels at how Dawayn spends hours working on cars, understanding how they work and fixing them without any training. On the football field and in the wrestling room at Millville High School—where he had been sent because of a juvenile placement at Devereux—he was exceptional. Penn State scouts attended his games. They told him he could be eligible for a partial scholarship when he was a sophomore and told him to keep playing.

*"This was the best time of my life,"* he says.

Then Devereux released him, and he was sent back to Camden.

He went to Woodrow Wilson High School and asked to enroll and play football. The administrators left the room, conferred, and came back with a verdict: they could not accept him. He had a criminal record. He did not have a parent with him. He told his mother, but she would not accompany him to straighten it out. *"I was already grown to her,"* he says. *"I had got myself in trouble so it was on me to get myself out."*

He gave up. A college scholarship was within reach, and a public high school had just told him—at fifteen—that he was not the kind of person they wanted. The lesson he drew was the only rational one available to him.

> *"I learned pretty early that nothing is fair, and nothing good comes out of trying to do right. I believed that then."*

The trajectory that followed was not inevitable. But it was the predictable result of a gatekeeping decision that foreclosed the one legitimate path that had been opening for him—and left him with no one in his life who had the standing or resources to force the door back open.

The accumulated weight of those early failures produced something more corrosive than anger: a disposition to yield, to expect the worst and regard it as confirmation rather than catastrophe. That reflex, he now understands, was the real injury. He is working to repair it.

## D. *Adolescence and the Streets*

Camden in the 1990s did not offer Dawayn Lindsey many alternatives. His older brothers—products of the same streets and the same absent father—taught him what they knew: how to fight, how to survive, how to protect the people he loved. *"I didn't know any other way to be raised,"* he says.

His juvenile and early adult criminal history reflect this formation. His first arrest, at fifteen, arose from recovering a friend's stolen bicycle and fighting the thief—a response that would be called loyalty in another setting. His protective instinct is real and consistent; Antoywayn confirms that

Dawayn *"can take what they dish out to him, but he doesn't want **you** to take what they dish out."* He took up for others. He took the consequences.

The charge that shaped the rest of his life came in 2005. A man appeared at his door grabbing his six-year-old stepdaughter by her shirt, angry that children had thrown rocks at his van. The next day, that man saw Dawayn in a shop, called him out, and attacked him. Dawayn saw the man draw a gun. He drew his own. The prosecution conceded the victim may also have fired,[2] and Dawayn pleaded guilty to a reduced charge of aggravated manslaughter and served fourteen years. He does not minimize what happened. He does not use it as an excuse. What he does is carry it — and choose, every day, to do better.

## III.  POST-CONVICTION REHABILITATION

### A.  The Decision to Change

Dawayn Lindsey has been incarcerated twice as an adult. Shortly following his release from the lengthy prison sentence Dawayn was incarcerated again. The second period—for a gun charge he describes as stemming from being *"drunk and stupid"*—ended in January 2024. He is still angry at himself for his irresponsible behavior during a night of overconsumption of alcohol. But by the time he came home the second time, something had settled.

Antoywayn noticed it immediately. *"I could feel it,"* he says. *"He was so centered, so focused."* This was not the Dawayn who came home in 2019, still finding his footing. This was a man executing a plan.

*"I am trying to get myself in shape to live civilized,"* Dawayn says. He uses that word—*civilized*—with genuine intention. He means it as an aspiration: to live the way he believes responsible people live, in ways he was never shown. To be civilized means to work within institutions that make up daily life, institutions he grew up believing were only meant for others. His goal is to raise his family very differently to how he was raised, to encourage his children to aspire to things he never even dreamed of, to model responsible adult behavior, ambition, hard work, and achievement.

### B.  Employment: The Long Grind

The employment landscape for a returning citizen in Camden is unforgiving. Dawayn does not pretend otherwise. When he returned to Camden in 2019, he tried temp agencies in Camden and found them unresponsive. So he looked for work in Cherry Hill, a wealthier, better resourced community nearby. He drove to Florence, New Jersey—a commute he initially made without a car. He was late. He was fired. He got a car, drove back, and asked to be rehired. They said no. He

---

[2] Vit, Jonathan. *Camden man sentenced for 2005 shooting death.* South Jersey Times, September 28, 2007 at https://www.nj.com/south/2007/09/camden_man_sentenced_for_2005.html

knocked on neighboring businesses until Firebird hired him to sort mail for USPS. He was too slow. He was fired again. He got another temp job making boxes at a candy shop.

His brother Antowayn recalls *"I just wanted to follow him around all day and make sure he was ok."* So Antoywayn quit his job and took another alongside Dawayn as janitors at Camden County College. Both were fired when the institution discovered their criminal histories. *"They sure don't make it easy,"* Antoywayn says. *"Even when you are trying so hard to do right, your past will come and bite you."*

When Dawayn returned to Camden in 2024, he was determined to do things differently. He secured a bakery job through a friend. He was upfront about his criminal history. They took a chance anyway. Dawayn did not miss a single shift. He worked nights—10:30 pm to 6:30 am—stopping by his house to get the children ready for school before heading directly to CDL training school from 7:30 am to 3:00 pm, came home, played with his children, slept, and did it again. He also worked overtime: rack runs to bakeries across the region, often the only one willing to do it. Dawayn explains:

> *I have been trying to do everything right. I could not stop what I am doing, or get off this path, just because I caught this case. Before it would have been enough for me to get discouraged. But I cannot even imagine that now. I want to be a truck driver so bad. To be civilized. I want my kids to grow up right.*

He continues:

> *We grow up wanting things too fast. I am willing to deal with process. I know it is not gonna happen tomorrow. I aint gonna stop. I love my job. I love driving that box truck. I just need to make more money so I can get my own truck. I want to save money for future. If my car breaks I don't have money to fix my car. When the counselor at One Stop told me I qualified for CDL classes because I was still in poverty, that was good for me to hear. I was working, but my job kept me in poverty. So I know that job is a steppingstone. It is not meant for me to be there forever. Now that I know, I want better.*

## C.  The CDL

Dawayn had been planning to earn a commercial driver's license since he was incarcerated. Through *One Stop*, a workforce development program serving people living in poverty, he qualified for CDL training. He enrolled at *Smith and Solomon Training School* on August 19, 2024 and attended through September 12, 2024, when he was forced to drop out due to a serious workplace injury. He was not deterred. When he finally received medical clearance to return to class, he had to start over from scratch. He re-enrolled on October 6, 2025 and graduated on December 15, 2025. Dawayn received a score of 100 in all three examined subjects: Theory, Behind the Wheel Range Skills, and Behind the Wheel Road Skills.

*"I cried when I got my CDL,"* he says.

7

The day he received his license, he registered Street2Street LLC with the State of New Jersey. He obtained an EIN from the IRS and a Certificate of Formation from the New Jersey Division of Revenue. He did not want to leave anything undone. He walked cold into a granite fabrication business (which he pronounced "gra-NITE" because he had only ever seen the word on that sign and had never heard it spoken). He pitched them on a hauling contract. They offered him a load on the spot. He could not take it because of the limitations on him while awaiting sentencing, but the experience of being taken seriously as a businessman, as a human with potential, was powerful.

> *I couldn't believe it. I thought he would shoot me down and I was willing to accept that. I thought at the very least they might give me some advice that could help me in the future. But it worked even better than I thought and they actually offered me work. People say you can't do it like that. But I did and it worked. That was good for me. I needed that.*

### D.  Family and Community



Dawayn Lindsey is the primary caregiver for six people: his own children, his girlfriend Ashley's children, and Ashley's grandchild. He is present in a way that his own father never was and that his community rarely sees. His girlfriend's oldest daughter, Taniyah, is taking online college classes and studying for a certificate in a healthcare field. *"I feel like Taniyah actually listens to me,"* he says. *"She wants more than what is going on and I am always talking to her about that. Right now I got her. She is gonna be alright."*

Taniyah credits Dawayn with holding her accountable to her studies when she became pregnant before graduating high school and ensuring she still achieved her dreams. She writes that Dawayn ensured that:

> *...I stayed on top of my grades, my passion for running track, and my dream of going to college. He made sure I never gave up on that. With the uplifting conversations we had nonstop 24/7 he made sure I achieved my goals. With his support I was able to finish school with a 4.0 GPA and receive over 13 scholarships not only for school but also for track. My stepdad made sure I walked across that stage and he beamed with pride from the side as one of my biggest supporters.*

Antoywayn watches Dawayn with his children and the neighborhood children who drift into the house and says what he sees: *"This is the projects. Dawayn is one of the rare men in the house around here."* Antoywayn is not being sentimental. He is describing a structural fact. Fathers who are home are rare in this neighborhood. Dawayn is home.



Figure 1. Density of Single Parent Homes In Camden, NJ. Highest density is shown in red. Dawayn's neighborhood is circled in black.
Source: Best Neighborhood



When Antoywayn begins to recount how Dawayn mentors the neighborhood boys, Dawayn goes quiet. He is not one to talk about this kind of thing. He does it because it is right, not because he wants credit for it. But with some prodding he explains that he noticed a neighbor's son drifting toward a different crowd. This boy had been a good student, and could reliably be found on the basketball court, but both of those things had stopped. Dawayn knew exactly what that meant, because he had lived it. So he made the boy an offer: new sneakers, with conditions. Stay in school. Keep playing basketball. *"Nothing in life is free,"* he told him, *"and my gift comes with some responsibilities."* With a smile Dawayn says, *"I am monitoring the situation."*

### E.  Learning to Ask: Self-Advocacy, Financial Literacy, and the Work of Unlearning

Dawayn Lindsey has spent his life navigating institutions that were not built for him—and learning, as a survival skill, not to expect anything from them. He accepted each rejection and saw no point in advocating, because advocacy had never worked and trying had, more than once, made things worse. Woodrow Wilson High School taught him that lesson at fifteen. Camden's temp agencies reinforced it. Prison confirmed it. For most of his life, self-sufficiency meant working around institutions, not within them—getting what you could from personal relationships and informal arrangements, because the formal systems were for someone else. His friend Shane notes, that he opted to join the military because he *"wanted to become part of this nation rather than just existing alongside it"* and *"to become a part of this country and the things that make it great."* Dawayn took a different route to wind up in the same place.

Since his most recent release, Dawayn has been taking stock in a deliberate and systematic way, and what he has concluded—with the help of a financial coach who agreed to mentor him—is that a significant portion of what he learned to survive has become an obstacle to building. He has things to unlearn. He is unlearning them.

The pattern is visible across every domain of his life since he came home. When Dawayn learned that *One Stop*, a workforce development agency, provided services to people in his situation, he did not assume he would be turned away. He walked in and asked what he was eligible for and

signed up immediately. When an injury derailed the program months in, he persisted. He inquired about the best course of action. He was told to get a medical clearance and return. He did. Thirteen months later, after surgeries and physical therapy he got the greenlight. Dawayn returned to school and started over from scratch, finishing with a perfect score in every subject. When this pending federal case cost him the trucking job he had been offered, he called the company himself, explained his situation, and asked whether he could reapply when the legal matter was resolved. They told him yes, to call when he was ready. He wrote it down. Dawayn's diligence, earnestness, humility has won over the staff he has encountered. , The school's administrator, Jeanette Stein, wrote a letter to this court, but then contacted me directly. *"I pray that Dawayn will be ok,"* she wrote, *"He is the sweetest man who really does mean well."*

When his daughter's teacher called to say she was performing above grade level, most fathers in his position would have received that as good news and moved on. Dawayn called the county's Department of Education to ask about the gifted program. He bought educational materials to keep her engaged at home. He had never been told that was a call he could make, or a resource he was entitled to—but he made the call anyway to advocate for his child.

The financial mentorship has been the most striking transformation to witness directly. This writer was present as Dawayn worked through his finances with his coach and then, without prompting, picked up the phone and began calling his credit card companies one by one. He identified recurring charges he had never authorized, requested their removal, and asked for credits on amounts he had already paid. He was calm, specific, and persistent. He cleared his outstanding balances. He established a ceiling—he would spend only what he earned. He sat his family down and explained that everyone would need to be more deliberate about money, because he was the one supporting all of them, and that required everyone's participation. He built a tracking system to record his spending and identify where savings were possible. He opened a savings account—the first of his life. The money going into it is for Street2Street, the trucking company he registered the day he received his CDL. He is not saving abstractly. He is saving for something specific, in a place he can watch it grow, according to a plan he built with a mentor recognizing the need to seek guidance from people who the knowledge and experience.

What this represents is not a man who has been rehabilitated by a program or a requirement. It is a man who has diagnosed his own patterns with honesty and is doing the harder, slower work of replacing them—one phone call at a time, one conversation at a time, one dollar at a time. He is forty-three years old and opening his first savings account. He is not embarrassed by that; he is proud. He is building from where he is. *"There is no shame in that,"* says Dawayn. Indeed, there is not.

10

### F. Substance Use and Treatment

Dawayn Lindsey's relationship with alcohol and marijuana has influenced his life, but does not reflect a chronic addiction requiring intensive intervention. He began drinking alcohol as a teenager and began smoking cannabis at approximately fifteen years old, progressing to regular use by sixteen or seventeen. Neither substance defined his adolescence or his adult life in the way that harder drugs defined his father's, but both were present, available, and normalized in the world he was navigating.

He has not used marijuana in years. The alcohol is more complicated, and Dawayn is honest about it. Dawayn tested positive for alcohol under pretrial supervision. The gun charge that sent him back to prison in 2020 was, by his own account, the product of a night he spent drunk and making choices he acknowledges were reckless and dangerous. He has said plainly that he was not serious enough when he came home that time — that he understood the stakes but had not yet internalized them in a way that changed his behavior.

When his pretrial officer, Ms. Blackwell, referred him to Oaks Integrated Care, Dawayn complied. He grew up surrounded by addiction and thought he knew what it looked like. He went anyway. *"I don't disregard any opportunity that comes my way,"* he says, a principle that, by this point in his life, has become something close to a rule.

He stopped drinking. Completely. And he has not tested positive since his treatment. What he found on the other side of that decision surprised him. *"I'm really glad,"* he says. *"I'm so clear-headed. I play more with my kids. I enjoy playing with my kids more."* He is not describing sobriety as a sacrifice. He is describing it as a gift he did not know he was missing — one that his pretrial officer pushed him toward when he was not looking for it. *"I really thank her, she could've punished me but she chose to help me"* he says, *"I should probably tell her that."*

The institutional record reflects consistent engagement with treatment across his adult life. He participated in a drug treatment program in 2018 while incarcerated. Upon release in 2019, he complied with a parole mandate to attend outpatient substance use treatment. In August 2025, following the referral from Pretrial Services, he enrolled at Oaks Integrated Care and successfully completed the program.

The two positive alcohol tests under pretrial supervision are part of this record, included here without qualification. So is what came after: a man who is now more present for his children than he has ever been. That arc — opportunity, dedication, genuine change — is the arc of Dawayn Lindsey's life, repeated across every domain this memo has documented. When Dawayn Lindsey is presented with an opportunity, he takes it for the gift it is and lets himself be changed by it.

11

## IV.  THE CITY THAT MADE HIM: CAMDEN, NEW JERSEY

*Everything has flown over the wall that could.  What is left are all those with broken wings. The problem with Camden is that so much is broken*.[3] – Reverend Michael Doyle, Sacred Heart Church, Camden NJ

Dawayn Lindsey did not grow up in poverty as a personal failing or a family quirk. He grew up in Camden, New Jersey—a city that had, by the time of his birth in 1982, been systematically stripped of its economy, its tax base, its schools, and its housing stock over three consecutive decades of disinvestment. Understanding what that city was doing to the children living inside it during Dawayn's formative years is not a mitigating footnote to his story. It is the story.

Camden, New Jersey had once been a thriving manufacturing community, anchored primarily by three prosperous companies: Campbell Soup, RCA Victor, and the New York Shipbuilding Company.  But in the forty years following the 1950 peak of its industrial prosperity, Camden endured severe economic stagnation and deindustrialization that resulted in a mass exodus of its middle-class population.  By the time Dawayn was born in 1982, the city had become devastated by crime, high unemployment and housing abandonment.  In 1989, the *New York Times* described Camden as a *"failed city,"* in which:

> *Fewer than 100 households in this city of 80,000 have incomes of more than $50,000.  Its children are the poorest in the nation; 61 percent live below the Federal poverty level.  On some of the city's worst blocks one-third of the houses have crumbled or collapsed, and children play on ruptured sidewalks and in lots strewn with shattered glass.[4]*

By 2006, more than half of Camden residents lived in poverty and the city's median household income of $18,007 was the lowest of any similarly sized city in the country. Rutgers University historian Howard Gillette, whose prize-winning study, *Camden After the Fall,* remains the definitive account of the city's trajectory, documented how *"deindustrialization, suburbanization, racial isolation, and political exploitation reduced Camden from industrial powerhouse to America's third poorest city"*—and argued that the residents who remained were not responsible for the conditions they inherited.[5]

### A.  Crime and Violence: The City Dawayn Navigated as a Child

Alongside Camden's economic decline, the city's crime rate continued to soar and was, by any measure, catastrophic. The decade following Dewayne's birth ushered in a murder rate that

---

[3] Kerr Peter, *Camden Forces Its Suburbs to Ask, What If a City Dies?*, New York Times, September 7, 1989. https://www.nytimes.com/1989/09/07/nyregion/camden-forces-its-suburbs-to-ask-what-if-a-city-dies.html?search-input-2=camden.

[4] *Id.*

[5] Gillette Jr., Howard. *Camden After the Fall*, Univ. of Pennsylvania Press, 2005. See also: Taibbi, Matt, *Apocalypse, New Jersey: Dispatch From Camden, America's Most Desperate Town*, Rolling Stone, December 11, 2013, https://www.rollingstone.com/culture/culture-news/apocalypse-new-jersey-a-dispatch-from-americas-most-desperate-town-56174/; Hedges, Chris, *City in Ruins*, The Nation, November 4, 2010, https://www.thenation.com/article/city-ruins/

regularly ran more than six times the national average, earning Camden the moniker *"Murder Capital of the United States."* In 2012, the FBI ranked it first in violent crime per capita among all American cities with populations above 50,000—worse than Detroit, Oakland, and Flint.[6]

The crack cocaine epidemic is inseparable from this story.

At the same time Camden was suffering crushing blows to its economy, crack had begun to flood the streets of the city creating economic opportunities for young hustlers, offering seemingly limitless earning potential and supplanting traditional sources of income. In Camden's neighborhoods dealers converted powder cocaine to crack in residential settings and open-air markets flourished on the same streets where children played.[7]

The introduction of crack into the community brought myriad social problems of its own, including gang violence, urban decay, and social disintegration. In blighted regions of the city, drug dealers were the only community members attaining economic success, supplanting athletes and fathers as heroes and role models.  It was easy to induce young, impressionable boys to join their enterprises.

In areas near crack markets the homicide rate for Black males aged 15 to 24 more than doubled in the years immediately following crack's arrival in the city, and seventeen years later, those rates were still 70 percent higher than they would otherwise have been.[8] While researchers have demonstrated that the majority of males in these communities avoided the drug trade directly, *"their close proximity to friends and acquaintances involved in the drug trade exposed them to increased risk of violence"*—a fact that led many young men to arm themselves for self-protection, creating the cycle of gun diffusion that persisted long after the crack markets themselves subsided.[9]

Dawayn Lindsey grew up surrounded by the detritus of this epidemic. He knows, or at least he thought he knew, what the sale of illicit substances looked like and, as he friend Shane Still writes, "it certainly wasn't being produced in well-established office buildings, or advertised on a various websites, nor shipped through the US Mail." The people Dawayn knew who were caught using illicit substances went to prison, unlike athletes accused of doping who simply lost their titles. No, the business he was cleaning at night looked nothing like the drug trade he knew intimately and had consciously eschewed.

---

[6] Harris, David. *Flint drops title of most violent in nation, according to expanded FBI stats*, The Flint Journal, October 29, 2012
[7] United States Department of Justice, National Drug Intelligence Center. "Philadelphia/Camden High Intensity Drug Trafficking Area Drug Market Analysis." 2006.
[8] Evans, William N., Craig Garthwaite, and Timothy J. Moore. *Guns and Violence: The Enduring Impact of Crack Cocaine Markets on Young Black Males.* Journal of Public Economics, 2021.
[9] *Id.*

### B. *"Knowledge Can Be Dangerous": The Neuroscience and Sociology of Learned Incuriosity in Urban War Zones*

*"[Housing projects] mean alcoholism, drug addiction, relentless petty stupidity, a kind of stir-craziness induced by chronic poverty and the human mind caged by the rigid bars of class and learned incuriosity." – Lynsey Hanley[10]*

When Dawayn Lindsey was approximately seven years old, his older brother Antoywayn climbed onto a Camden rooftop that overlooked an alley used as a stash by a local drug dealer. The dealer stabbed Antoywayn in the back with a broken bottle. The wound landed on his spinal cord. Surgery was too dangerous. Antoywayn lay in a hospital bed for an extended period while the family waited to learn the extent of the damage. Dawayn was seven years old. He watched. He learned. *Be careful where you look. Knowledge can be dangerous.*

As the years went by, Dawayn was exposed to increasing levels of violence. His oldest brother Anthony was his first brother to be shot with a gun. Then his brother Andre. Until six of 10 brothers became victims of gun violence. That was not all. Their friends also got shot. His friends got shot. As far as Dawayn could tell, getting shot was the most natural thing in the world. At twenty-one, it was his turn. Dawayn's younger brother ran to the house to tell him he was being harassed by a group of older men on the street. Dawayn knew from experience it is best to nip these things in the bud, or the harassment would continue and get worse. He accompanied his brother to attempt to squash the problem. He did not know they had guns. Up to this point, Dawayn had never carried a gun. He did not feel he needed it. But there on the street, in broad daylight and in the presence of his little brother, several men drew their weapons. Dawayn was shot in the foot with armor-piercing rounds, he later learned, the kind designed to defeat a bulletproof vest. Surgery followed. A broken heel bone. A cast. Dawayn doesn't regret going. *"If it wasn't me,"* he says, "*it would have been my brother."* But it was after the shooting that he began carrying a gun for the first time in his life. *"I realized I cannot protect myself with my hands, if someone else is carrying a gun."* That realization was prescient. Within the year, that decision to arm himself would save his life.

Cornell University developmental psychologist James Garbarino coined the term "urban war zone" for areas like Camden, NJ where children absorb chronic violence at levels comparable to active combat, documenting that children in these environments develop cognitive adaptations functionally identical to combat-related PTSD: hypervigilance, suppression of developmental curiosity, and the systematic narrowing of one's perceptual world to minimize exposure to dangerous information.[11] The residents of Camden don't need an expert to explain this phenomenon. They live it Dawyan's friend, Shane Still, a combat veteran, knows that his PTSD diagnosis stems as much from what he experienced in Camden as what he lived in Iraq

---

[10] Hanley, Lynsey. *Estates: An Intimate History.* Granta Books, 2007.
[11] Garbarino, James. *Lost Boys: Why Our Sons Turn Violent and How We Can Save Them.* Free Press, 1999, pp. 21–22.

14

and Afghanistan. He asks, *"...when this country will start recognizing what it takes to survive a city like [Camden] and what it means when someone does."*[12]

Academic research confirms that proximity to violent crime reorganizes children's cognition toward threat detection and away from neutral inquiry—and that these patterns become stable and durable over time.[13] The child who does not look into alleys, who does not ask questions about the business around him, who keeps his knowledge carefully minimal, is the child more likely to survive. Elijah Anderson's foundational ethnographic research documents how this orientation—originally formed as survival strategy—hardens into the behavioral rule that governs all of a person's institutional engagements, not just the dangerous ones.[14]

On the streets of Camden children learn that they must protect themselves. *Don't ask questions. Mind your business.* Dealers and others with violent stakes in secrecy enforce silence physically, as Antoywayn's stabbing demonstrated. Even relying on law enforcement can be a double-edged sword. Urban Institute research across six cities found fewer than one-third of residents in high-crime neighborhoods believe police respect their rights,[15] and researchers Kirk and Papachristos document that legal cynicism—the belief that law and its agents are illegitimate and will not protect you—becomes a stable, transgenerationally transmitted feature of heavily policed communities.[16] For the residents of Camden, whose city police department was ultimately disbanded in 2013 after a corruption scandal so pervasive that courts overturned 88 wrongful convictions caused by officers planting evidence and committing perjury, that cynicism had a documented institutional basis. The rational behavioral strategy that both threats produced was identical: minimize visibility, minimize knowledge, ask nothing.

The impulse to turn a blind eye to the events around you may seem counterintuitive in an information saturated world beyond the confines of communities like Camden. But it is a tried and true safety mechanism for those on the inside.

Fortunately, the same literature that documents how this instinct for self-preservation forms also establishes that it can be changed. Dawayn Lindsey has already begun. He has begun to amass a support system, people who can help him identify these behaviors and redirect him into better practices. He has taken on a financial coach, participated in addiction treatment, received professional training, and made inroads with local non-profits dedicated to encouraging him on his journey. Dawayn is not simply behaving differently; he is thinking differently. His

---

[12] Still, Shane. Letter. March 2026

[13] McCoy, Dana Charles, C. Cybele Raver, and Patrick Sharkey. "Children's Cognitive Performance and Selective Attention Following Recent Community Violence." Child Development, vol. 86, no. 1, 2015, pp. 355–69.

[14] Anderson, Elijah. *Code of the Street: Decency, Violence, and the Moral Life of the Inner City*. W.W. Norton, 1999, pp. 33–36.

[15] LaVigne, Nancy, Urban Institute. "How Do People in High-Crime, Low-Income Communities View the Police?" Urban Institute, February 22, 2017 urban.org/research/publication/how-do-people-high-crime-low-income-communities-view-police

[16] Kirk, David S., and Andrew V. Papachristos. "Cultural Mechanisms and the Persistence of Neighborhood Violence." American Journal of Sociology, vol. 116, no. 4, 2011, pp. 1190–1233.pubmed.ncbi.nlm.nih.gov/21648250/

engagement with treatment, mentors and self-reflection aligns with therapeutic literature emphasizing *"pro-social identity reconstruction"* as a critical step in recovery and desistance.[17] Since his arrest, Dawayn has been asking questions in settings where asking used to feel impossible. For the six children watching him do it, this is the most important thing happening in their household.

Cognitive Behavioral Therapy (CBT), which is now the most widely studied and implemented rehabilitation framework in federal and state criminal justice systems, targets precisely the *"flawed or maladaptive thoughts, attitudes and beliefs"* that the National Institute of Justice identifies as driving criminogenic behavior—including the street code's specific prohibition on institutional engagement, questioning, and self-advocacy.[18] A meta-analysis of 58 studies published between 1965 and 2005 found that CBT significantly reduces recidivism even among high-risk offenders.[19]

Critically, the NIJ research documents that CBT is most effective in community settings when combined with employment support, family engagement, and other stabilizing structures — precisely the conditions that a community-based sentence for Dawayn Lindsey would preserve and that incarceration would destroy.[20] A 2024 systematic review confirms the RNR (Risk-Need-Responsivity) model's identification of *"procriminal attitudes"*—the thought patterns generated by street-code socialization—as central criminogenic needs that community-based CBT is specifically designed to address, and that community settings outperform institutional ones for CBT efficacy.[21]

### C. Schools: The System That Was Supposed to Save Him

If Camden's streets offered one version of reality to Dawayn Lindsey, its schools offered another—and it was nearly as bleak. The Camden City School District was, for the entirety of his childhood and young adulthood, one of the worst-performing school systems in the state of New Jersey and arguably the country. So rotten was this institution that the state assumed control of the district in 2012. By that time, 23 of Camden's 26 public schools ranked in the bottom five percent of all schools in New Jersey, less than half of all students graduated from high school, and a majority of students failed to demonstrate proficiency in math and language. The state takeover was triggered

---

[17] Maruna, Shadd. "Making Good: How Ex-Convicts Reform and Rebuild Their Lives." American Psychological Association, 2001. psycnet.apa.org/fulltext/2001-18143-000-FRM.pdf

[18] National Institute of Justice. "Does Cognitive Behavioral Therapy Work in Criminal Justice? A New Analysis from CrimeSolutions." https://nij.ojp.gov/topics/articles/does-cognitive-behavioral-therapy-work-criminal-justice-new-analysis-crimesolutions.

[19] Landenberger, Nana A., and Mark W. Lipsey. "The Positive Effects of Cognitive-Behavioral Programs for Offenders: A Meta-Analysis of Factors Associated with Effective Treatment." Journal of Experimental Criminology, vol. 1, no. 4, 2005, pp. 451–476. https://psycnet.apa.org/record/2006-01988-004

[20] National Institute of Justice. "Five Things About Reentry." https://nij.ojp.gov/topics/articles/five-things-about-reentry.

[21] Smith, Andrew et al. "Revisiting the effectiveness of cognitive-behavioural therapy for reducing reoffending in the criminal justice system: A systematic review." *Campbell systematic reviews* vol. 20,3 e1425. 31 Jul. 2024, doi:10.1002/cl2.1425

16

in part by evidence of grade-fixing scandals and financial mismanagement that had persisted for more than two decades before anyone intervened. In announcing the state takeover, then Governor Chris Christie acknowledged that Camden was spending $23,709 per student—far above the statewide average of $18,045—yet producing outcomes at the absolute bottom of every measurable category.[22] The problem was not resources alone. It was decades of corrupt governance, political patronage over academic mission, and a district so disconnected from student outcomes that grade-fixing was preferable to acknowledging failure.[23] The children paid for it.

Jonathan Kozol wrote his devastating exposé of inequal neighboring school systems, *Savage Inequalities*, in 1991. Dawayn was 9 years old. He compared Camden to the neighboring township of Cherry Hill where Camden's middle class had fled in the 1960s and 1970s. By contrast, Cherry Hill operated one of New Jersey's best-performing public-school systems, flush with state-of-the-art science and computer labs, numerous enrichment programs, and graduation rates significantly higher than the state and national average.[24] The children of Cherry Hill and the children of Camden attended schools separated by a ten-minute drive and an entirely different universe of expectation, investment, and outcome. The children of Camden did not choose their school district. They were assigned to it by their parents' inability to afford anything else.

This writer's family was part of the exodus to Cherry Hill in the 1970s and benefitted from these stark differences. In Cherry Hill my second-generation American father was able to thrive, ultimately becoming a judge serving Camden, where he occasionally had to recuse himself from case involving cases involving our former neighbors, Black and White, who had become collateral damage of city's collapse. In many ways, geography is destiny.

### D. The Neighborhood Effect: What Growing Up in Camden Does to Outcomes

The social science research on *"neighborhood effects"*— the independent contribution of where a child grows up to their subsequent life outcomes, controlling for family income and individual characteristics—is among the most robust in the field. Harvard economist Raj Chetty and colleagues, in a landmark study using IRS records for millions of American children, found that the neighborhood in which a child grows up has a powerful, independent causal effect on their adult earnings, incarceration rates, and health outcomes—and that these effects are particularly pronounced for Black children, especially boys.[25]

Chetty's team found that African American boys who grow up in high-poverty, high-crime areas with low social mobility—the precise description of Camden in the 1980s and 1990s—fare

---

[22] Ly, Laura, "State of New Jersey Stepping In to Run Camden's Troubled Schools," CNN March 25, 2013. https://www.cnn.com/2013/03/25/us/new-jersey-camden-schools

[23] Osborne, David, et, al. "After Seven Years of Broadly-Supported School Choice, How Are Camden Students Faring?," NJ Education Report, January 27, 2020) How are Camden Students Faring

[24] Kozol, Jonathan. "Children of the City Invincible: Camden, New Jersey." *Savage Inequalities: Children in America's Schools,* Crown Publishers, 1991.

[25] Chetty, Raj et al. "The Effects of Exposure to Better Neighborhoods on Children: New Evidence from the Moving to Opportunity Experiment." *The American economic review* vol. 106,4 (2016): 855-902. https://www.aeaweb.org/articles?id=10.1257/aer.20150572

dramatically worse as adults than African American boys with identical family incomes who grow up in better neighborhoods. Exposure to violence, absence of employed male role models, concentration of peers involved in the criminal economy, and school systems that fail to transmit human capital all independently depress outcomes. Camden stacked all of these risk factors simultaneously, at extreme levels, for the entire duration of Dawayn Lindsey's childhood.

Researchers studying children's experiences specifically in Camden have documented what the aggregate statistics suggest: children in the city navigate a world defined by violence, disinvestment, and institutional failure, and yet are rarely heard from in the policy discourse that shapes their lives. A dissertation study of Camden children found that they live with an acute awareness of the city's dangers and instabilities, that they develop sophisticated adaptive strategies for navigating them, and that their resilience—their ability to continue functioning and even to aspire—is remarkable and frequently invisible to outside observers who see only the crime statistics.[26] Dawayn Lindsey's trajectory—his football talent, his academic placement, his persistent attempts at legitimate employment upon every release from prison—fits this profile precisely.

### E. The Labor Market Dawayn Actually Inhabited: Night Shifts, Criminal Records, and the Nighttime Economy

Understanding Dawayn Lindsey's employment history requires understanding the labor market he actually inhabited—not the one available to workers without records, without interrupted work histories, and without Camden zip codes.

Two-fifths of all employed Americans work evenings, nights, weekends, or rotating shifts. For low-wage workers, the share is significantly higher, with sixty percent of nonstandard-schedule workers earning below the national median.[27] Black and Latino workers are overrepresented in these schedules at every income level. This is not a personal choice. It is the structural reality of a service economy whose lower-wage positions—food production, janitorial services, security, transportation, warehousing—operate around the clock and are disproportionately staffed by workers with limited formal credentials, interrupted employment histories, or criminal records.[28]

Camden makes this structural reality even more acute. Of employed Camden residents, 88% commute outside the city for work—meaning the city exports its labor force to the surrounding economy while retaining little of the economic activity generated.[29] When state economic development subsidies brought new employers to Camden between 2022 and 2024, Camden residents comprised just 9% of those hired, and their positions were overwhelmingly in lower-

---

[26]Watson, Nyeema. *Reading Camden: Examining the Lives of Children in Camden.* Diss. Rutgers University–Camden, 2015. rucore.libraries.rutgers.edu/rutgers-lib/47161/PDF/1/play/

[27]Enchautegui, Maria E. "Nonstandard Work Schedules and the Well-Being of Low-Income Families." Urban Institute, July 2013, urban.org.

[28]Presser, Harriet B. *Working in a 24/7 Economy: Challenges for American Families.* Russell Sage Foundation, 2003.

[29]Walter Rand Institute for Public Affairs, "City of Camden Economic Landscape Data Story," Rutgers University–Camden. October 2022. Economic Landscape

wage service and support roles.[30] For Camden residents with criminal records, the picture is bleaker still. Research documents that the callback rate for Black applicants with criminal records is approximately 4%—less than a third of the already-low 17% callback rate for white applicants with records.[31] Formal job markets, in other words, are not meaningfully available to men like Dawayn Lindsey. The jobs that are available come through personal networks, operate outside normal business hours, and do not advertise.

A man who works the overnight shift at a bakery, attends CDL classes each morning on no sleep, and accepts an evening ███████ job through a trusted friend is not exhibiting the behavior of someone involved in a criminal enterprise. He is exhibiting the behavior documented by decades of sociological research on low-income Black workers in post-industrial cities: working every available shift in every available economy, because the formal economy has made clear it has no reliable place for him.[32] The overnight bakery job and the evening janitorial job were not suspicious. They were, for a Black man in his forties with a felony record in Camden, the labor market.

## V. CONCLUSION

Dawayn Lindsey has been a man devoted to his rehabilitation since he returned to the community in 2024. His efforts were sincere, but not without missteps. The offense before this Court was not an intentional return to criminal activity. It was the error of a man who needed a temporary means to continue supporting his family while he healed from a work-related injury. Even in this time of incertitude, Dawayn continues to pursue his dream of becoming a truck driver and to learn from his mistakes. More importantly, he is providing consistency, guidance, love and economic support to six dependents who need him.

A sentence that accounts for these circumstances—one that imposes meaningful accountability while preserving what Dawayn Lindsey has built and honoring the people who depend on him— is a sentence this record can support.

Submitted by Jill Steinberg, Mitigation Specialist*

March 26, 2026

---

[30] Anya Gizis, "Billions in Subsidies, Pennies in Pay: Companies in Camden Flop Hiring Locally," *Good Jobs First*, June 2025, Good Jobs
[31] Beasley, Christopher R, and Y Jenny Xiao. "Incarceration history and ethnic bias in hiring perceptions: An experimental test of intersectional bias & psychological mechanisms." *PloS one* vol. 18,1 e0280397. January 17, 2023, Ethnic Bias in Hiring

\* Jill Steinberg is a licensed private investigator and mitigation specialist in private practice, with 16 years of experience.  She is a former mitigation specialist and investigator with the Philadelphia Federal Defender office, trained in mitigation, sentence advocacy, victim outreach, reentry planning and alternative sentencing. She has a BA from the University of Georgia and an MA from New York University.

