

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*50 Main Street, Suite 1100*
*White Plains, New York 10606*

April 1, 2026

**BY ECF & EMAIL**

The Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas Street
White Plains, New York 10601

> **Re:** *United States v. Dawayn Lindsey*, 25 Cr. 480 (KMK)

Dear Judge Karas,

The Government respectfully submits this letter in advance of the sentencing of defendant Dawayn Lindsey, scheduled for Thursday, April 9, 2026, at 10:00 a.m. Lindsey pled guilty pursuant to a plea agreement to one count of conspiracy to distribute anabolic steroids, in violation of Title 21, United States Code, Sections 846 and (b)(1)(E). The applicable range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") is 37 to 46 months' imprisonment, as stipulated to under the parties' plea agreement and as correctly calculated by Probation in the Presentence Report ("PSR"). For the reasons explained below, a sentence at the low end of the Guidelines range would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

## I. Factual Background

Dawayn Lindsey played a relatively brief, minor role in a long-running criminal conspiracy to distribute large quantities of anabolic steroids and to launder the proceeds thereof.[1] In particular, from at least in or about September 2021 through at least in or about February 2025, co-conspirators Carl Bezick and Joseph Thompson, along with others known and unknown conspired to conduct a scheme to sell anabolic steroids and other controlled substances whose distribution is regulated by the Controlled Substances Act, through an online website ("www.buygorillaking.com" or "https://buygorillaking.to" or "Gorilla King"). Lindsey joined the conspiracy in or around August 2024 and participated in it—primarily assisting his longtime friend Thompson in the production and distribution of steroids and taking care of various menial tasks—through his arrest in February 2025. (*See* PSR ¶ 5).

---

[1] Lindsey had no involvement in the money laundering side of the business.

The Gorilla King Steroid Distribution Organization

During the conspiracy, the Gorilla King website offered for sale a number of Schedule III controlled substances—including anabolic steroids—as well as prescription pharmaceuticals and other substances associated with the use of performance enhancing drugs.[2]  Customers had the option to pay online with Bitcoin or arrange payment through limited other means that could be arranged via email.  (PSR ¶ 6).

The Gorilla King website displayed "test reports" from a third-party testing company, purporting to show that the substances, including anabolic steroids, sold by Gorilla King were, in fact, the substances advertised on the Gorilla King website.  For example, Gorilla King sold a product labelled "Test E 250mg," and the Gorilla King website displayed a test report from the third-party company purporting to show that a sample of Gorilla King's "Test E" product contained 266.50 mg/ml of testosterone enanthate, a Schedule III controlled substance.  The test reports displayed on the Gorilla King website listed a particular email address beginning in "gorillaking" (the "Gorilla King Email Address") as the client that requested the test reports from the third-party company.  (PSR ¶ 7).

In or around August 2023, law enforcement officers identified a United States Postal Service ("USPS") Priority Mail parcel shipped from Warminster, Pennsylvania with a shipping label funded by cryptocurrency (the "August 2023 Parcel") as a potential shipment of controlled substances.  Law enforcement officers subsequently interviewed the recipient of the August 2023 Parcel, who stated, in sum and substance, that certain parcels he had received from return addresses in Pennsylvania, such as the August 2023 Parcel, contained anabolic steroids ordered online from Gorilla King.  (PSR ¶ 8).

The individual who shipped the August 2023 Parcel was captured on USPS cameras in the act of shipping the August 2023 Parcel and identified, based on records from the Pennsylvania Department of Transportation, as Joseph Thompson.  (PSR ¶ 9).

On or about December 5, 2023, law enforcement agents conducted a controlled purchase of the following items from www.buygorillaking.com: (i) four units of "Tren A 100mg"; (ii) four units of "Test E 250mg"; (iii) four units of "Inj. Dbol 80mg"; and (iv) one unit of "Cialis 50mg."  The agents purchased these items on the Gorilla King website using Bitcoin and had the items shipped to an address in New York, NY.  Laboratory testing revealed that the substance sold as "Test E" contained testosterone enanthate and the substance sold as "Tren A" contained "trenbolone acetate," each of which is a Schedule III controlled substance and an anabolic steroid.  (PSR ¶ 10).

On or about November 15, 2024, law enforcement agents conducted a second controlled purchase from Gorilla King, placing an order for the same items purchased in the prior December

---

[2] Individuals who use anabolic steroids often engage in "post cycle therapy," in which they consume hormones and other substances in an effort to limit the negative side effects associated with anabolic steroid use.  The Gorilla King website sold "post cycle therapy" hormones and substances.

5, 2023 controlled purchase.  Law enforcement agents purchased these items from Gorilla King using Bitcoin and had the items shipped to the same address in New York, NY as the prior controlled purchase.  The shipment from Gorilla King arrived on or about November 22, 2024, and contained items labelled as Anastrazole 1mg tablets, Cialis 50mg, Anavar 20mg, and Drostanolone Enanthate 20mg, as well as twenty units of an unlabeled substance.  Anavar is a brand name for oxandrolone, and oxandrolone and drostanolone are each Schedule III controlled substances and anabolic steroids.  (PSR ¶ 11).

<u>Participation of Dawayn Lindsey</u>

The Gorilla King steroid trafficking organization maintained multiple premises in Philadelphia, Pennsylvania, for the manufacture of anabolic steroids and other substances during the course of the conspiracy, including a location on Paul Street (the "Paul Street Location") and an office space at a warehouse on Godfrey Avenue (the "Godfrey Avenue Location").  (PSR ¶ 12).

On August 16, 2024, law enforcement officers, through surveillance of Carl Bezick (the leader of the Gorilla King enterprise), identified the Paul Street Location as Gorilla King's then-current manufacturing location.  However, on August 29, 2024, Bezick, Thompson, and Lindsey disassembled and abandoned the Paul Street Location in the middle of the night, after a known co-conspirator fled law enforcement surveillance earlier that day.  Specifically, between approximately 4:10 a.m. and 4:29 a.m. on August 29, 2024, Thompson, Bezick, and Lindsey exchanged several calls and a text message.  Less than one hour later, Thompson and Lindsey arrived at the Paul Street Location and began removing large black bins with yellow tops.  In total, in four trips to and from the Paul Street Location over the following few hours, Thompson and Lindsey removed approximately 15 large bins from the Paul Street Location using a vehicle registered to Bezick's spouse.[3]  On September 13, 2024, Thompson and Lindsey returned to the Paul Street Location and removed additional items using the same vehicle.  (PSR ¶ 13).

After abandoning the Paul Street Location, the Gorilla King steroid trafficking organization moved its manufacturing and distribution operation to the Godfrey Avenue Location. Between approximately November 5, 2024 and February 6, 2025, law enforcement observed Lindsey entering the Godfrey Avenue Location on approximately 24 separate occasions, typically arriving late at night with Thompson or another co-conspirator and leaving the following morning. (PSR ¶ 14).

Following the August 29, 2024 disassembling of the Paul Street Location, Thompson and Lindsey continued to exchange messages relating to the Gorilla King steroid trafficking organization.  For example, on September 30, 2024, Thompson texted Lindsey indicating Lindsey's official entry into the Gorilla King enterprise:  "You got a job wit me. $1500 a week.  Lemme know if you're on board.  No time for games bro."  Lindsey responded, "Yeah

---

[3] Also on August 29, 2024, the Gorilla King website posted an announcement that Gorilla King would be "closed for 2 weeks" for a "restock."  The Gorilla King website in fact remained "closed" for business until October 7, 2024, when the Gorilla King website reopened and, separately, an account using the name "Gorillakingz" posted on an online forum dedicated to steroids, stating that Gorilla King was "Back Online."

n***a." Further, on November 3, 2024, Thompson, apparently frustrated with Lindsey's work for Gorilla King, texted Lindsey: "U just started and put me behind 3 times already. You asked me to bring u on board, not the other way around. My apologies for making u wait the last 2 days but my man u already have done the same. It ain't ya place to concern me w ya personal life. It's business. Don't expect all of your pay this week my guy. I see you gladly take it when you don't have to work the days." Additionally, on November 25, 2024, Thompson texted Lindsey: "We got 100 orders to do." (PSR ¶ 15).

## February 6, 2025 Search and Arrest

On or about February 6, 2025, law enforcement officers conducted a search of the Godfrey Avenue Location. At the time of the search, Lindsey and Thompson were each present in the Godfrey Avenue Location and were engaged in the manufacturing, measuring, and packaging of anabolic steroids (pictured, in part, below). At the time officers entered the premises, Lindsey, in particular, was wearing blue rubber gloves (pictured below) consistent with handling chemical substances. (PSR ¶ 16).



*Anabolic Steroids Being Produced by Lindsey and Thompson on February 6, 2025*



*Lindsey Wearing Blue Rubber Gloves on February 6, 2025*

4

During the search, law enforcement found hundreds of already-filled vials of injectable anabolic steroids—including vials labelled as drostanolone enanthate and trenbolone acetate—labeled with Gorilla King branding.  Law enforcement also found bins of oral anabolic steroids, as well as several heat-sealed packages ready for shipment to customers (pictured below).  In total, law enforcement recovered tens of thousands of grams of Schedule III controlled substances, including but not limited to testosterone enanthate, trenbolone acetate, oxandrolone and drostanolone from the search of the Godfrey Avenue Location, where Lindsey and Thompson were arrested.  Law enforcement also recovered customer order books, including one that was open and next to the steroids that were mid-manufacture at the time of the search.  (PSR ¶ 17).


*Vials of Injectable Anabolic Steroids with Gorilla King Branding*


*Additional Labelled Bins of Oral Anabolic Steroids*



*Heat-Sealed Packages for Shipment (Customer Names Redacted)*

## II.  The Plea and Guidelines Calculation

On October 16, 2025, the defendant pleaded guilty, pursuant to a plea agreement, to one count of conspiracy to distribute and possess with intent to distribute (i) testosterone enanthate; (ii) trenbolone acetate; and (iii) drostanolone, each an anabolic steroid and a Schedule III controlled substance, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(E). As reflected in the parties' plea agreement and correctly calculated in the PSR, the applicable Guidelines range is 37 to 46 months' imprisonment.  (PSR ¶¶ 83).  In particular, pursuant to U.S.S.G. §§ 2D1.1(a)(5) and (c)(10) and Note F to the Drug Quantity Table, Application Note 8(D), the base offense level is 20, because the offense involved more than 60,000 units of Schedule III substances.  Two levels are removed because the defendant was a minor participant in the criminal activity.  Three levels are removed for acceptance of responsibility, resulting in a final offense level of 15.  Lindsey is in Criminal History Category V, which yields an advisory range of 37 to 46 months' imprisonment.

Probation recommends a sentence of 37 months' imprisonment.  (PSR at 24).  Probation weighed the seriousness of the offense and the defendant's "worrisome" criminal history—including his commission of this offense less than one year after his most recent release from prison—against mitigating considerations, including financial hardship the defendant was experiencing as a result of an on-the-job injury and his adjustment to supervision.  (*See* PSR at 24-25).

The defendant seeks a non-custodial, below-Guidelines sentence of "probation or supervised release, with conditions that include a lengthy period of home detention and a significant amount of community service." Dkt. 37 ("Def. Sent. Mem.") at 1.

## III. Applicable Law

The Sentencing Guidelines continue to provide important guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Though they are advisory and not mandatory, the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 46 (2007). Thus, district courts should treat the Sentencing Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49; *see also Booker*, 543 U.S. at 264 (explaining that district courts must "consult" the Sentencing Guidelines and "take them into account" when sentencing). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49.

After calculating the applicable Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the purposes of sentencing discussed in the next paragraph, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statements by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants," and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, Section 3553(a) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence for criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## IV. A Sentence at the Low-End of the Guidelines Range Is Appropriate

Under the above framework, the Government respectfully submits that a sentence at the low end of the applicable Guidelines range—consistent with that recommended by Probation—is sufficient but not greater than necessary to comply with the purposes of sentencing, taking into account the factors set forth in 18 U.S.C. § 3553(a). In particular, the nature and seriousness of

the offense, the need to promote respect for the law, and the need to promote adequate deterrence together weigh in favor of a sentence at the low end of the Guidelines range.

*First*, a sentence at the low end of the Guidelines range is necessary to reflect the nature of the offense and the seriousness of the defendant's conduct. Gorilla King was a serious, extensive criminal enterprise, producing and distributing thousands upon thousands of grams of Schedule III controlled substances to customers around the country for at least 3.5 years, and laundering the proceeds of those sales through a variety of means. Even if prescribed by a doctor and produced by trained scientists at regulated pharmaceutical companies, performance-enhancing drugs can have serious side effects. Gorilla King sold anabolic steroids and similar substances produced by Lindsey, Thompson, Bezick and others in small, unregulated warehouse spaces, for unsupervised consumption by users across the country. As the defendant himself recognizes "this type of unsupervised dispensation of controlled substances posed a threat and could have had serious medical consequences." (Def. Sent'g. Mem. at 9).

On the other hand, as the defendant points out in his sentencing submission, Lindsey participated in the Gorilla King conspiracy for only approximately 6 months and did so in a relatively minor role—helping his longtime friend, Thompson, move the Gorilla King production and distribution center from the Paul Street Location to the Godfrey Avenue Location, and then assisting Thompson in overnight production and distribution of controlled substances on approximately 24 occasions thereafter. While a significant and extended offense, Lindsey's participation was limited in comparison to that of his co-conspirators. A sentence toward the bottom of the Guidelines range appropriately balances the serious nature of the Gorilla King conspiracy and the defendant's role in that conspiracy.

*Second*, the need to promote specific deterrence and respect for the law, and to protect the public, support a custodial sentence within the applicable Guidelines range. The defendant has at least seven prior adult criminal convictions. (PSR ¶¶ 37-44). These convictions involved violence, including a 2005 aggravated manslaughter conviction, (*see* PSR ¶¶ 39, 41-44); drug distribution, (*see* PSR ¶¶ 38, 40); and firearms use and possession, (*see* PSR ¶¶ 39, 41, 44). That history, combined with the defendant's commission of the instant offense less than a year after his release from his most recent firearms conviction, raises serious recidivism concerns and indicates that a period of incarceration within the Guidelines range—even if at the bottom of the Guidelines range—is necessary to promote specific deterrence and respect for the law, and to protect the public.

*Finally*, a sentence within the Guidelines range would serve the purpose of general deterrence. It would send a message to the community that mass production and distribution of any controlled substances, including anabolic steroids, is a serious crime that will result in significant penalties.

Moreover, the mitigating factors identified by the defense do not support the extreme downward variance requested. While it is true, as discussed above, that the defendant is less culpable than his co-conspirators, the Guidelines calculation already explicitly takes into account the defendant's "minor role"—and does not include enhancements applied to other co-conspirators for money laundering, sale of drugs through mass marketing by means of an interactive computer service, or maintaining a premises for the purpose of manufacturing or distributing a controlled

substance. Even beyond the actual Guidelines calculation, both the Government and Probation have taken the defendant's role into consideration in recommending a bottom-of-the-Guidelines sentence. The variance requested by the defendant, by contrast, essentially brushes aside the seriousness of the conduct and the defendant's extensive criminal history, which is a significant driver of the Guidelines range in this case.

Similarly, the defendant's background, financial hardship that may have contributed to his participation in the Gorilla King enterprise, provider role for his family, and positive post-arrest behavior may justify a sentence toward the bottom of the Guidelines range. However, these relatively common circumstances simply cannot justify a downward variance, much less a non-incarceratory sentence here.

The Government respectfully submits that the defendant's role and circumstances are more than adequately accounted for in the Government's charging decision (which did not include a money laundering count), plea agreement (which included a minor role enhancement and omitted several enhancements applied to co-conspirators), and, now, sentencing recommendation. In sum, a sentence toward the bottom of the applicable Guidelines range—consistent with Probation's recommendation—would adequately balance the various considerations under § 3553(a) and would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.

## V. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant at the low end of the Guidelines Range of 37 to 46 months' imprisonment.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:  _____

Benjamin Levander
Assistant United States Attorney
Tel: (212) 637-2571

cc:    James Neuman, Esq.